UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. 1:24-CR- 279 |
| | : | |
| v. | : | (JUDGE Mehalchick) |
| | : | |
| **JOSHUA WHITE,** | : | |
| Defendant. | : | |

## I N D I C T M E N T

THE GRAND JURY CHARGES:



### COUNT 1
18 U.S.C. § 371
(Conspiracy)

## I.   BACKGROUND

At times material to this Indictment:

### RELEVANT INDIVIDUALS AND ENTITIES

1.    Creed White owned and operated an aluminum smelting and processing business in Yoe, York County, Pennsylvania called Aluminum Alloys Mfg, LLC ("Aluminum Alloys").

2.    Joshua White was Creed White's son.

3.    Joshua White lived on the premises of Aluminum Alloys and was employed by or provided various services to Aluminum Alloys at Creed White's direction.

4.     Unindicted Coconspirator #1 was an employee of Aluminum Alloys and was primarily responsible for service and sales.

5.     Unindicted Coconspirator #2 was an employee of Aluminum Alloys and was primarily responsible for bookkeeping and accounting services.

6.     In addition to Aluminum Alloys, Creed White owned or controlled 18 other corporate entities, none of which had employees or business operations.  These dormant, non-operational entities included: Aluminum Alloy Transportation & Repair LLC; American Scrap LLC; Atlantic Coast Aluminum Inc.; Atlantic Coast Aluminum LLC; Busche Alum Tech LLC; Gettysburg Foundry Specialties Corp.; Hanover Resource Recovery Corp.; House of Windsor LLC; Linamar USA, LLC; Mahoney Foundries LLC; Moran Materials Recycling Inc.; Pinnacle Cores LLC; Scrap Transport LLC; Tap Enterprises LLC; Tape Enterprises American Aluminum Alloys LLC; Tristate Commodities LLC; Waynesboro Recycling LLC; and White Metal Recycling Company LLC (collectively, "the Non-Operational Businesses").

2

## THE PAYCHECK PROTECTION PROGRAM

7.     The Paycheck Protection Program (PPP) was a COVID-19 pandemic relief program administered by the Small Business Administration (SBA), which provided forgivable loans to small businesses for job retention and certain other expenses.  The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage obligations, accounts payable, and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic.  PPP loans were fully guaranteed by the SBA.

8.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain a PPP loan.  These certifications included that the business was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes, or paid independent contractors, as reported on a Form 1099-MISC.

9.    Moreover, the amount of the PPP loan that could be approved under the PPP and implementing regulations was a function of the applicant business's historical payroll costs, consisting of compensation to its employees.

10.    A business applying for a PPP loan was therefore required to provide documentation to demonstrate its payroll expenses, such as filed federal income tax documents. The applicant for a PPP loan was required to certify that the information included as part of the application was true and correct and acknowledged that false or fraudulent representations could subject the applicant to prosecution.

11.    PPP loan applications were completed, signed, and submitted or caused to be submitted electronically by the borrower. The applications were received through SBA servers located in Virginia and Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the borrower business.

12.    As noted, the proceeds of a PPP loan could be used only for specific purposes, including payroll costs, costs related to continuation of group healthcare benefits, mortgage interest payments (but not

4

mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or for refinancing certain specified SBA loans. The proceeds of a PPP loan were not permitted to be used by borrowers to purchase real property or make capital improvements. The loan proceeds were also not permitted to be used to purchase consumer goods, automobiles, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specific authorized expenses.

## THE ECONOMIC INJURY DISASTER LOAN PROGRAM

13.     The Economic Injury Disaster Loan (EIDL) Program was an existing disaster-related program that was expanded by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act of March 2020. The EIDL program was administered by the SBA and provided low-interest financing (including forgivable advances of up to $10,000) to small businesses and other eligible entities experiencing substantial financial disruption resulting from the COVID-19 pandemic.

14.     To qualify for an EIDL, an applicant business had to meet certain criteria, including, among other things, that it was in operation

prior to the pandemic, and had regular operating expenses, which would have been paid if not for the COVID-19 pandemic. Moreover, the amount of the loan that could be approved under the EIDL program typically was a function of the applicant's working capital.

15.    To qualify for an EIDL, an applicant business was required to submit an application directly to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the same 12-month period. In the case of EIDLs for COVID-19 relief, the 12-month period was January 31, 2019, to January 31, 2020. The applicant was also required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

16.    EIDL applications were submitted directly to the SBA via an online portal and processed by the agency with support from a government contractor. If the application was approved, the amount of the loan was based, in part, on the information the applicant provided about employment, revenue, and costs of goods sold. Any funds issued as part of an EIDL came directly from the United States Treasury.

6

17.    EIDL applications were received and processed using computer servers located in the states of Iowa, Virginia, and Washington. EIDL disbursements were initiated by the SBA using computer servers located in the state of Colorado, which transmitted the payment information to the United States Treasury using computer servers located in the state of Virginia.

18.    EIDL proceeds could be used only to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds were not intended to replace lost sales or profits or for expansion of a business.

## II.    THE CONSPIRACY AND ITS OBJECTS

19.    Beginning in or about March 2020, and continuing through in or about September 2022, in the Middle District of Pennsylvania, and elsewhere, the defendant,

### JOSHUA WHITE,

together with Creed White, Unindicted Coconspirator #1, Unindicted Coconspirator #2, and others known and unknown to the Grand Jury, did knowingly conspire and agree with each other to commit the following offenses against the United States, all in violation of 18

7

U.S.C. § 371:

a.    *Wire Fraud*—that is, knowingly to devise a scheme and artifice to defraud financial institutions, the SBA, and other lenders, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343;

b.    *Bank Fraud*—that is, to knowingly devise, and intend to devise, a scheme and artifice to defraud financial institutions, and to obtain and attempt to obtain by means of materially false and fraudulent pretenses, representations, and promises, moneys, funds, credits, assets, securities, and other property owned by, or under the custody or control of a financial institution, in violation of Title 18, United States Code, Section 1344;

c.    *False Statements on Loan Applications*—that is, for the purpose of influencing the action of financial institutions and the SBA, in connection with loan applications, knowingly to make false statements and reports concerning revenue, payroll, number of

employees, and to supply false and fictitious documents in support thereof, in violation of Title 18, United States Code, Section 1014; and

d. *Aggravated Identity Theft*—that is, during and in relation to any violation of Title 18, United States Code, Sections 1343 (wire fraud) and 1344 (bank fraud), knowingly to transfer, possess, and use, without lawful authority, a means of identification of another person, in violation of Title 18, United States Code, Section 1028A.

20. It was a purpose and object of the scheme and conspiracy for Joshua White and his coconspirators to fraudulently obtain moneys, funds, credits, assets, and other property owned by, and under the custody and control of (a) financial institutions—namely, PPP loan proceeds—and (b) the SBA through the EIDL program, through materially false pretenses, representations, and promises.

## III.    MANNER AND MEANS OF THE CONSPIRACY

The conspiracy was accomplished, in part, by the following manner and means:

21. It was part of the conspiracy that Creed White filed and caused others to file, by means of the internet and interstate wires, more than 120 applications for PPP loans and EIDLs with third-party

9

intermediary lenders and the SBA on behalf of the Non-Operational Businesses. Of these applications, 42 PPP loan and EIDL applications were approved, for more than $11,500,000 in funds that were transferred by interstate wires into accounts that Creed White owned or controlled.

22.    It was further part of the conspiracy that Joshua White, acting at Creed White's direction, obtained personally identifying information from both complicit and unwitting third parties that he and Creed White and their coconspirators knowingly transferred, possessed, and used without lawful authority in the applications for PPP loans and EIDLs.

23.    It was further part of the conspiracy that Joshua White and Creed White made and caused others to make, by means of the internet and interstate wires, material misrepresentations in the PPP loan applications filed with third-party intermediary lenders and FDIC-insured financial institutions, and in the EIDL applications filed with the SBA.

24.    For example, the PPP and EIDL applications Creed White, Joshua White, and their coconspirators submitted and caused to be

10

submitted included material misrepresentations that the individuals

listed as applicants on the loan applications owned, controlled, or

operated the Non- Operational Businesses, when in fact they did not.

The applications also included material misrepresentations that the

Non-Operational Businesses under Creed White's and Joshua White's

control had actual business operations, when in fact they did not.

25.    As further example, Joshua White, Creed White, and their

coconspirators caused the PPP loan and EIDL applications to include

material misrepresentations and false supporting documents, including

false information attesting to the number of employees purported to be

employed by the Non-Operational Businesses, fabricated bank and

other financial statements that Joshua White, Creed White, and their

coconspirators created to give the appearance that they were

legitimate business records, and false payroll information.

26.    The applications further included material

misrepresentations and certifications that the PPP and EIDL funds

would be used for payroll costs, business-related purposes, and other

authorized expenditures, when Joshua White, Creed White, and

their coconspirators knew that the funds would not be used for those

11

purposes.

27.   It was further part of the conspiracy that Joshua White, Creed White, and their coconspirators created, caused to be created, sent, and caused others to send, by means of the internet and interstate wires, forged and fraudulent documents to third-party intermediary lenders and FDIC-insured financial institutions, in support of PPP loan applications, and to the SBA in support of EIDL applications.

28.   For example, Creed White, Joshua White and their coconspirators created, caused to be created, sent, and caused others to send, forged and falsified Internal Revenue Service documents, including Forms 941 federal employment tax documents.  Those forged and falsified IRS documents contained material misrepresentations, including false employee headcount information, fabricated information concerning employee wages paid, taxes withheld, taxes remitted to the IRS, income, gross receipts, costs of goods sold, and business expenses. Moreover, the forged and falsified IRS documents were represented as having been filed with the IRS, when in fact they were not.

29.   It was further part of the conspiracy that Joshua White,

Creed White, and their coconspirators caused the proceeds of fraudulently obtained PPP loans and EIDLs to be deposited, by means of interstate wires or other transfers, into bank accounts in Joshua White's or Creed White's names or under their control.

30.   It was further part of the conspiracy that Creed White transferred and caused others to transfer the proceeds of fraudulently obtained PPP loans and EIDLs, including by means of the internet and interstate wires.

31.   It was further part of the conspiracy that Creed White used and caused others to use the proceeds of fraudulently obtained PPP and EIDL funds for impermissible purposes, including to make capital improvements to Aluminum Alloys, to purchase business vehicles and other heavy equipment, to pay off business debts (including a mortgage on a building), to purchase aluminum scrap, and to make other unauthorized expenditures for his personal benefit.

32.   It was further part of the conspiracy that Joshua White used proceeds of fraudulently obtained PPP loans for impermissible purposes, including for his personal benefit and enrichment.

## IV.  ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Pennsylvania and elsewhere:

33.    On or about May 15, 2020, Creed White and Joshua White submitted via the internet a $126,300 PPP loan application to Citizens Bank on behalf of Busche Alum Tech LLC ("Busche").  In Busche's PPP loan application, Creed White and Joshua White falsely represented that Joshua White owned Busche, when in fact Creed White did.  In Busche's PPP loan application, Creed White and Joshua White falsely represented that Busche had ongoing business operations and employees, knowing that Busche had no business operations and no employees.  In Busche's PPP loan application, Creed White and Joshua White falsely attested that the PPP loan proceeds would be used for expenses authorized under the PPP when, in fact, they intended to use the loan proceeds for unauthorized purposes.  In addition, Joshua White and Creed White negotiated an agreed-upon payment that Joshua White would receive for allowing Creed White to use his personally identifying information as part of the Busche PPP loan application.

34.    On or about May 18, 2020, Citizens Bank approved Busche's PPP loan application and deposited approximately $126,300 into Creed White's Citizens Bank account ending in -2117. On an unknown date in 2020, Creed White paid Joshua White at least $30,000 out of the proceeds obtained from Busche's PPP loan, which was an unauthorized use of the PPP loan proceeds.

35.    On or about May 17, 2020, Creed White, with Joshua White's knowledge and assistance, submitted via the internet a $130,000 PPP loan application to Cross River Bank on behalf of Linamar USA LLC ("Linamar"). In the PPP loan application, Creed White falsely represented that a third party with the initials J.S.—an actual person—owned Linamar, when in fact Creed White did. In the PPP loan application, Creed White falsely represented that Linamar had 16 employees and an average monthly payroll of $52,000, when he and Joshua White knew that Linamar had no employees and no monthly payroll. In support of the loan application, Creed White included false and fraudulent IRS Forms 941 that he and other coconspirators created. To make it appear that J.S. owned Linamar, Joshua White and Creed White knowingly obtained J.S.'s Social Security Number and used J.S.'s Social Security Number as part of the

Linamar PPP loan application.

36.    On or about May 19, 2020, Cross River Bank approved Linamar's PPP loan and deposited approximately $130,000 into Creed White's Citizens Bank account ending -2001.

37.    On or about June 23, 2020, Creed White, with Joshua White's knowledge and assistance, submitted via the internet a PPP loan application to First Home Bank and an EIDL application to the SBA on behalf of Atlantic Coast Aluminum Inc.  In the PPP loan and EIDL applications, Creed White falsely represented that a third party with the initials E.S.—an actual person—owned Atlantic Coast Aluminum, when in fact Creed White did.  In the PPP loan and EIDL applications, Creed White falsely represented that Atlantic Coast Aluminum had ongoing business operations, employees, and payroll expenses, when he and Joshua White knew that Atlantic Coast Aluminum had no business operations, employees, or payroll.  To make it appear that E.S. owned Atlantic Coast Aluminum, Joshua White and Creed White knowingly obtained E.S.'s Social Security Number and Pennsylvania driver's license and knowingly used E.S.'s Social Security Number and driver's license as part of Atlantic Coast Aluminum's PPP loan and EIDL applications without lawful authority.

16

38.    On or about June 25, 2020, the SBA issued Atlantic Coast Aluminum a $10,000 EIDL grant and caused $10,000 to be deposited into Creed White's Citizens Bank account ending in -7929.

39.    On or about July 21, 2020, Creed White, with Joshua White's knowledge and assistance, submitted via the internet a $402,500 PPP loan application to Newtek Small Business Finance on behalf of Tape Enterprises-American Aluminum Alloys LLC ("Tape Enterprises"). In the PPP loan application, Creed White falsely represented that a third party with the initials B.G.—an actual person—owned Tape Enterprises, when in fact Creed White did. In Tape Enterprise's PPP loan application, Creed White falsely represented that Tape Enterprises had ongoing business operations, employees, and payroll expenses, when he and Joshua White knew that Tape Enterprises had no business operations, employees, or payroll. To make it appear that B.G. owned Tape Enterprises, Joshua White and Creed White knowingly obtained B.G.'s Social Security Number and Pennsylvania driver's license and knowingly used B.G.'s Social Security Number and driver's license as part of Tape Enterprises's PPP loan application without lawful authority.

40.    On or about July 28, 2020, Newtek Small Business Finance

17

approved Tape Enterprises's PPP loan application and caused
approximately $402,500 to be deposited into Creed White's Radius
Bank account ending in -2292.

41.    On or about August 4, 2020, Creed White, with Joshua
White's knowledge and assistance, submitted via the internet a
$419,460 PPP loan application to Lending Club Bank on behalf of
American Scrap LLC ("American Scrap"). In American Scrap's PPP
loan application, Creed White falsely represented that a third party
with the initials A.G.—an actual person—owned American Scrap, when
in fact Creed White did. In American Scrap's PPP loan application,
Creed White falsely represented that American Scrap had ongoing
business operations, employees, and payroll expenses, when he and
Joshua White knew that American Scrap had no business operations,
employees, or payroll. To make it appear that A.G. owned American
Scrap, Joshua White and Creed White knowingly obtained A.G.'s Social
Security Number and Pennsylvania driver's license and knowingly
used A.G.'s Social Security Number and driver's license as part of
American Scrap's PPP loan application without lawful authority.

42.    On or about August 18, 2020, Lending Club Bank approved
American Scrap's PPP loan application and caused approximately

$419,460 to be deposited into Creed White's Radius Bank account ending in -8729.

43.     On or about March 23, 2021, Joshua White, with Creed White's knowledge and assistance, submitted via the internet a $175,000 PPP loan application to Northeast Bank on behalf of Tristate Commodities LLC ("Tristate").  In Tristate's PPP loan application, Joshua White falsely represented that Tristate had ongoing business operations, 21 employees, and an average monthly payroll of $70,000, knowing that Tristate had no business operations, employees, or payroll.  In Tristate's PPP loan application, Joshua White falsely represented that the PPP loan proceeds would be used to retain workers, maintain payroll, and to pay for other authorized expenses, knowing that he intended to use the proceeds for his own personal benefit and enrichment.

44.     On or about March 31, 2021, Northeast Bank caused approximately $175,000 to be deposited into Joshua White's Citizens Bank account ending in -3407.

All in violation of Title 18, United States Code, Section 371.

THE GRAND JURY FURTHER CHARGES:

## COUNT 2
18 U.S.C. § 1344
(Bank Fraud)

45.    The facts alleged in paragraphs 1 through 18, 20 through 32, and 43 through 44 are incorporated here.

46.    From on or about March 23, 2021, through on or about March 31, 2021, the defendant,

### JOSHUA WHITE,

knowingly devised a scheme and artifice to defraud Northeast Bank, a financial institution as defined in Title 18, United States Code, Section 20, and to obtain moneys and funds owned by and under the custody and control of Northeast Bank, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts (the "bank fraud scheme").

47.    At times material to the bank fraud scheme, Joshua White was the sole owner of a Pennsylvania limited liability company called Tristate Commodities LLC.

48.    Northeast Bank participated as a lender in the PPP program.

49.    On or about March 23, 2021, for the purpose of executing and

20

attempting to execute the bank fraud scheme, Joshua White signed and submitted to Northeast Bank an application for a PPP loan in the name of Tristate Commodities LLC, which requested a PPP loan in the amount of $175,000, and which falsely represented that Tristate Commodities LLC had 21 employees and an average monthly payroll of $52,000.

All in violation of Title 18, United States Code, Sections 1344 and 2.

THE GRAND JURY FURTHER CHARGES:

### COUNT 3
18 U.S.C. § 1014
(False Statements on Loan Application)

50.    The facts alleged in paragraphs 1 through 18, 20 through 32, and 43 through 44 are incorporated here.

51.    On or about March 23, 2021, in the Middle District of Pennsylvania, the defendant,

**JOSHUA WHITE,**

knowingly made a false statement for the purpose of influencing the action of Northeast Bank, an institution the deposits of which were insured by the Federal Deposit Insurance Corporation, in connection with Tristate Commodities LLC's application for a PPP loan, by falsely representing that Tristate Commodities LLC had 21 employees and an average monthly payroll of $52,000.

21

In violation of Title 18, United States Code, Sections 1014 and 2.

THE GRAND JURY FURTHER CHARGES:

### COUNT 4
18 U.S.C. § 1028A
(Aggravated Identity Theft)

52.    The facts alleged in paragraphs 1 through 18, 20 through 32, and 35 through 36 are incorporated here.

53.    On or about May 17, 2020, in the Middle District of Pennsylvania, the defendant,

### JOSHUA WHITE,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of J.S., a person known to the Grand Jury, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, bank fraud, knowing that the means of identification belonged to another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1).

THE GRAND JURY FURTHER CHARGES:

## COUNT 5
18 U.S.C. § 1028A
(Aggravated Identity Theft)

54.    The facts alleged in paragraphs 1 through 18, 20 through 32, and 37 through 38 are incorporated here.

55.    On or about June 23, 2020, in the Middle District of Pennsylvania, the defendant,

## JOSHUA WHITE,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of E.S., a person known to the Grand Jury, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, bank fraud, knowing that the means of identification belonged to another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1).

THE GRAND JURY FURTHER CHARGES:

## COUNT 6
18 U.S.C. § 1028A
(Aggravated Identity Theft)

56.    The facts alleged in paragraphs 1 through 18, 20 through 32,

and 39 through 40 are incorporated here.

57.    On or about July 21, 2020, in the Middle District of

Pennsylvania, the defendant,

### JOSHUA WHITE,

did knowingly transfer, possess, and use, without lawful authority, a

means of identification of B.G., a person known to the Grand Jury, during

and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to

wit, bank fraud, knowing that the means of identification belonged to

another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1).

24

THE GRAND JURY FURTHER CHARGES:

## COUNT 7
18 U.S.C. § 1028A
(Aggravated Identity Theft)

58.    The facts alleged in paragraphs 1 through 18, 20 through 32, and 41 through 42 are incorporated here.

59.    On or about August 4, 2020, in the Middle District of Pennsylvania, the defendant,

## JOSHUA WHITE,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of A.G., a person known to the Grand Jury, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, bank fraud, knowing that the means of identification belonged to another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1).

## FORFEITURE ALLEGATION

60.    The allegations contained in paragraphs 1 through 59 of this Indictment are realleged and incorporated here for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c).

61.    Upon conviction any of the offenses charged in Counts 1 through 7 of this Indictment, the defendant,

## JOSHUA WHITE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted.

62.    If any of the property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third party;

   c.    has been placed beyond the jurisdiction of the court;

26

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot

           be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute

property pursuant to Title 18, United States Code, Section 982(b), Title

21, United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c).

A TRUE BILL

GERARD M. KARAM
United States Attorney

_Christen T. Haugsby_

CHRISTIAN T. HAUGSBY
Assistant United States Attorney

FOREPERSON

10 / 10 / 24

Date

27